[Cite as *State v. Christon*, 2020-Ohio-1524.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-43 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-346 |
| | : | |
| KALI N. CHRISTON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of April, 2020.

. . . . . . . . . . .

MARCY VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, Appellate Division, 61 Greene Street, Suite 200, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

P.J. CONBOY, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Kali N. Christon appeals from his conviction of murder following a jury trial on charges of murder and felonious assault; the offenses were merged for sentencing.

{¶ 2} In his sole assignment of error, Christon contends the jury's verdicts were against the manifest weight of the evidence.

{¶ 3} The record reflects that Christon was charged with the offenses set forth above for allegedly abusing his six-week-old son by inflicting blunt-force injuries to the child's head, resulting in hemorrhaging that proved fatal. At trial, police dispatcher Steffi Lutz testified that Christon called 911 at 3:17 a.m. on March 8, 2018 and reported that his child had not been breathing for approximately 30 minutes. During the call, the dispatcher heard Christon say, "I probably f***ed him up." On cross-examination, the dispatcher acknowledged that she did not know the context of the statement. She conceded it was possible that Christon was referring to performing CPR improperly.

{¶ 4} Fairborn police officer Sam Fullen was the first to arrive on the scene. He proceeded to an upstairs bedroom of Christon's residence and saw the child lying on the floor on his back. The child was not breathing, and Fullen could not detect a pulse. Fullen proceeded to perform CPR. Fairborn police officers John Hood and Matthew Haytas arrived shortly after Fullen. Hood spoke with Christon at the scene and asked what had happened. Christon responded that he woke up to the baby crying and went downstairs to prepare a bottle. He came back upstairs and tried to feed the child. Christon told the officer that the baby would not take the bottle and went "limp." Christon stated that he performed CPR on the child for about 40 minutes before calling 911. Hood and Haytas both described Christon's demeanor as "very calm."

**{¶ 5}** The next witness at trial was Kent Depue, an emergency-room doctor at Dayton Children's Hospital. He testified that the victim had no pulse and was not breathing upon arrival at the hospital. Resuscitation efforts were unsuccessful, and Depue pronounced the child dead after about 30 minutes. On cross-examination, Depue agreed that performing CPR improperly could cause injury. On redirect examination, he explained that the expected injury primarily would involve broken ribs. He testified that he never had seen subdural or subarachnoid hemorrhaging due to improper administration of CPR.

**{¶ 6}** Kasey Hockett, the mother of the deceased child, also testified as a prosecution witness. Hockett testified that she and Christon had two children together. They were separated at the time in question. She lived with the children in Huber Heights, and Christon lived with his aunt in Fairborn. Hockett sometimes stayed with Christon at the Fairborn residence. On March 6, 2018, she dropped the children off to stay with Christon for a couple of days. Hockett testified that the victim had no health problems when she left him with Christon. At six weeks of age, the child was not able to roll over by himself. Hockett had not seen the child fall and had not dropped the child. Hockett stated that Christon called her at 3:14 a.m. on March 8, 2018 and reported that the six-week-old child was not breathing. Christon hung up when Hockett asked whether he had called 911.

**{¶ 7}** Hockett testified that on prior occasions Christon became angry and frustrated when the child would cry. She explained that he would yell and hold the child's mouth closed for a couple of seconds until she would tell him to stop. Sometime after the child's death, Hockett made a recorded telephone call to Christon and asked him about an autopsy report identifying blunt-force trauma to the head as the cause of death.

Christon responded by calling the report "bulls**t" and saying "they make everything up." Hockett also testified that Christon previously had complained about the child needing to learn to stop crying so much. According to Hockett, Christon had told her that the child needed to learn to "be a man" and not cry. Hockett acknowledged, however, that she never had seen Christon hit the child.

{¶ 8} Christon's aunt, Tonya Watkins, testified that Christon had his own bedroom at her house. He shared the bedroom with his two children and sometimes Hockett. She stated that she never saw him act inappropriately with his children. In the early morning hours of March 8, 2018, he awoke her and told her that there was something wrong with the baby and that he had been performing CPR. Watkins then assisted with performing CPR until police arrived and took over.

{¶ 9} Fairborn detective Ryan Whittaker testified about interviewing Christon with another detective on March 8, 2018. At that time, Christon told the detectives that he awoke around 2:00 a.m. or 2:30 a.m. to find his six-week-old child crying in his bed. He went downstairs and prepared the child a bottle. He then returned and attempted to feed the child. Christon told the detectives the baby refused the bottle and went "limp." According to Whittaker, Christon claimed that he performed CPR for approximately 30 minutes before getting his aunt. Christon told the detectives that everyone else was asleep when he went to make the bottle and that it took him no more than five minutes. Christon also denied that anyone had dropped the child or that the child had rolled off of the bed. He claimed that he had been with the child the entire time and that no one else had cared for him. Christon also stated that he had not left the house the prior day and that he had been with the child the whole time. When asked why he did not call 911

sooner, Christon responded that he thought he could revive the child.

{¶ 10} Detectives Whittaker and Shane Hartwell interviewed Christon a second time on April 30, 2018. By that time, the detectives knew that blunt-force trauma to the head was the cause of the child's death. When confronted with these findings, Christon responded that someone else in the house might have dropped the child. He also suggested that other children in the house might have watched the infant while he stepped outside to smoke. He continued to insist, however, that the child was not exhibiting any signs of injury prior to going limp and stopping breathing. When Whittaker accused Christon of shaking the child, he responded "damn" but did not admit shaking or striking the infant.

{¶ 11} Detective Hartwell also testified as a prosecution witness. He essentially corroborated detective Whittaker's testimony about the two interviews. In particular, he testified that Christon initially denied that anyone else had cared for the child. Christon also told Hartwell that the only other person in the bedroom besides himself and the six-week-old infant was his other child, who was almost two years old. Christon told Hartwell that this other child had been asleep throughout the time in question. After being confronted with evidence about blunt-force trauma during the second interview, Christon told Hartwell that someone else might have been watching the infant and might have dropped him.

{¶ 12} The next witness at trial was forensic pathologist Susan Brown. She testified that she performed an autopsy on the deceased infant. The autopsy revealed that the child exhibited subdural and subarachnoid hemorrhaging, which involved bleeding around the brain. Brown also noted hemorrhaging involving both eyes as well as bruising

on the child's back and contusions on the scalp, cheek, lip, and forearm. In addition, the child had a laceration of the upper frenulum, which is a small piece of tissue inside the mouth connecting the lip to the gums. Brown also noted the existence of rib fractures without hemorrhaging, which indicated that the fractures were post-mortem and attributable to CPR. Brown opined that the child's cause of death was blunt-force trauma to the head and that the manner of death was homicide. She explained that pressure from bleeding on the brain caused problems with the child's breathing and heartbeat and resulted in death.

{¶ 13} The final witness was Dr. Kelly Liker, the chief of the division of child advocacy at Dayton Children's Hospital. Liker was board-certified in pediatric child abuse. She opined that a six-week-old child would not be able to crawl, walk, or sit up independently. Nor could a child that age inflict the type of injuries at issue. For that reason, Liker stated that a care giver would be expected to be aware of the cause of such injuries. Based on her review of available records, Liker opined that the infant would have exhibited symptoms and acted abnormally immediately after sustaining the subdural and subarachnoid hemorrhaging. Symptoms might include vomiting, seizures, going limp, not moving, and being non-responsive to stimuli. Liker stated that a loss of consciousness would occur within minutes. In her medical opinion, the injuries at issue were not the result of a fall or being dropped. Rather, the trauma to the child's head resulted from multiple impacts. Liker added that the tear to the child's frenulum was consistent with something forcibly being inserted into the mouth. Liker also opined that the child was incapable of causing 15 observed bruises on his body by himself. Liker testified that she never had seen a case in which CPR caused subdural or subarachnoid hemorrhaging. She agreed,

however, that the child's rib fractures could have been caused by CPR. She also opined that Christon's other child, who was almost two years old, would have been incapable of inflicting the severe injuries at issue. Liker noted too that, according to Christon, this child was asleep during the entire incident. In Liker's view, the victim's injuries resulted from physical abuse.

{¶ 14} On cross-examination, Liker dismissed the notion that Christon's nearly two-year-old child repeatedly could have hit the victim in the head and thrown the victim on the floor while Christon was downstairs preparing a bottle. Liker also noted that, by Christon's own admission, this other child was asleep when he went downstairs and remained asleep when he returned upstairs. On redirect examination, Liker observed that Christon claimed the victim was still in bed, and not on the floor, when he returned upstairs. Liker added that she never had seen brain hemorrhaging caused by blows inflicted by a two-year-old child. On recross-examination, Liker was informed that four other children between the ages of 10 and 16 years old also lived in the house. She noted, however, that there was no reported history of any of these people being in the bedroom with the victim at the time of the injuries. To the contrary, the case history reflected that the only people present were the victim, the two-year-old child, and Christon.

{¶ 15} Based on the evidence presented, a jury found Christon guilty of felonious assault and murder as a proximate result of committing felonious assault. The trial court merged the two counts as allied offenses of similar import. The State elected to proceed to sentencing on the murder conviction. The trial court imposed a prison term of 15 years to life. This appeal followed.

{¶ 16} In his assignment of error, Christon contends the jury's guilty verdicts on the

felonious assault and murder charges were against the manifest weight of the evidence. Christon asserts that he never before had injured either of his children. With regard to the incident in question, he claims he went downstairs to prepare a bottle and does not know whether someone else entered the bedroom and injured the infant during his five-minute absence. He also suggests that someone else in the house might have cared for the child earlier when he went outside to smoke and might have dropped the child. In addition, Christon notes that Dr. Liker could not say specifically how the child's injuries occurred. He notes too that the coroner did not determine specifically what caused the blunt-force trauma to the child's head, who caused the injuries, or precisely when they occurred. Under these circumstances, Christon maintains that the jury's guilty verdicts were against the weight of the evidence.

{¶ 17} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 18} With the foregoing standards in mind, we conclude that the jury's verdicts finding Christon guilty of felonious assault and murder were not against the weight of the evidence. The trial court instructed the jury that felonious assault required proof that

Christon knowingly caused serious physical harm to his infant child. *See* R.C. 2903.11(A)(1). The trial court instructed the jury that murder required proof that Christon caused the death of his infant child as a proximate result of committing an offense of violence, namely felonious assault. *See* R.C. 2903.02(B). The weight of the evidence supported the jury's verdict that the State proved both offenses beyond a reasonable doubt.

{¶ 19} Christon initially told police that no one but him had watched or cared for his infant child. He asserted that the child had no prior injuries, had not been dropped, and had not rolled out of bed. He also claimed everyone else was asleep when he went downstairs to prepare a bottle. After being confronted with evidence that the child died from multiple blunt-force trauma injuries to the head, Christon changed his story. He theorized that other people in the house might have harmed the child while he was downstairs. The record contains no evidence, however, that anyone else in the house entered the bedroom or was even awake. The infant's mother, Kasey Hockett, also testified that she was at Christon's residence on March 6, 2018, and, at that time, everything he needed to prepare a bottle was kept in his bedroom, suggesting that he had no need to go downstairs. Dr. Liker also rejected any possibility that the infant may have injured himself, that Christon's two-year-old child may have inflicted the injuries, or that the brain hemorrhaging may have occurred when Christon performed CPR. Liker opined that the infant's various injuries were the result of physical abuse. The jury also heard testimony about Christon having a history of being frustrated by the infant crying and trying to stop the crying. The 911 operator overheard him say "I probably f***ed him up" in an apparent reference to the infant. In short, the jury reasonably could have

concluded that Christon was the only person who reasonably could have caused the child's injuries and that those injuries were the result of child abuse, including multiple blows to the head that caused subdural and subarachnoid hemorrhaging and resulted in death. The present case was not one in which the evidence weighed heavily against Christon's conviction. The jury's guilty verdicts on the charges of felonious assault and murder were not against the weight of the evidence. Christon's assignment of error is overruled.

{¶ 20} The judgment of the Greene County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and FROELICH, J., concur.

Copies sent to:

Marcy Vonderwell
P.J. Conboy
Hon. Michael A. Buckwalter